631 F.2d 1161
 26 Fair Empl.Prac.Cas. 733,
24 Empl. Prac. Dec. P 31,389
Clarence MERRIWEATHER et al., Plaintiffs,
Charles H. Hood and Vallie J. Cunningham,
Plaintiffs-Appellees Cross- Appellants,
v.
HERCULES, INCORPORATED, et al., Defendants,
Hercules, Incorporated, Defendant-Appellant Cross-Appellee.
 No. 79-1554.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 1, 1980.
 
 C. V. Stelzenmuller, D. Frank Davis, Birmingham, Ala., for defendant-appellant cross-appellee.
 Adams & Clemon, O. Williams Adams, III, Oscar W. Adams, Jr., Birmingham, Ala., for plaintiffs-appellees cross-appellants.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before VANCE and GARZA, Circuit Judges and ALLGOOD,* District Judge.
 GARZA, Circuit Judge:
 
 
 1
 In 1974, seventeen black employees of Hercules, Inc. sought a class action against the company under Title VII of the Civil Rights Act of 1964. In 1976, a consent decree was signed by the district court resolving the dispute between the class and the company. The consent decree included a provision, however, which allowed four individuals to submit their cases to a special master. A fifth employee who was not a named plaintiff was added to this group when he objected to the proposed consent decree. He later withdrew his objection when the parties agreed to allow him to have his case heard by the special master.
 
 
 2
 All five of the individuals who were allowed to submit their cases to the special master did so. The special master conducted extensive hearings and submitted an Opinion and Findings resolving all the claims before him. The special master determined that three of the employees had failed to carry their burden of demonstrating that their discharges were based upon racial discrimination. The special master also found that two of the plaintiffs, Charles Hood and Vallie Cunningham, had been victims of racial discrimination. The special master concluded that Hood should receive seniority and partial back pay and that Cunningham should receive seniority and full back pay.
 
 
 3
 The district court adopted the special master's opinion and received evidence regarding back pay and attorneys fees. After making certain deductions, the district court awarded both Hood and Cunningham back pay and ordered Hercules to pay $15,000 in attorneys' fees. Hercules now appeals the district court's decision as it affects Hood and Cunningham. Hood and Cunningham cross-appeal on the issues of back pay and attorneys' fees. Finding no error in the special master's opinion and the district court's adoption of that opinion and subsequent orders and finding more than substantial evidence to support the findings, we affirm.
 
 
 4
 Charles Hood was an employee of Hercules from April, 1965, until April 1974. Hood was employed for most of that time as a tube machine operator. Until 1970 or 1971, he was considered a good employee. At that time, he began having difficulties with his health. Although he was meeting his production, he appeared very tired. Between 1971 and April, 1974, Hood missed fifty-six days due to sickness. Nonetheless, in his entire tenure at Hercules, a period of approximately nine years, he received only one reprimand.
 
 
 5
 On the basis of his seniority, Hood submitted a bid for the higher paying job of slurry operator. He was told by his superior that in his present condition, his chances were slim of receiving the job. He was told to see the company physician, Dr. Robert T. Cale. In April 1974, Hood visited Dr. Cale. Dr. Cale discovered that Hood had an active duodenal ulcer. Dr. Cale recommended that Hood not work for a short while, put him on a special diet and told him to quit smoking. Although Hood apparently adhered to the diet, he continued to smoke.
 
 
 6
 Dr. Cale continued to postpone the date on which Hood could return to work. In September of that year, Dr. Cale informed Hercules that Hood could perform light work but that no such work was available at Hercules. In November, 1974, Hood was admitted to a hospital under the care of Dr. Carl Robinson. He was shortly discharged after having been given medication and placed on a diet. In 1975, Hood's condition improved, and in July of that year Dr. Robinson stated that Hood could return to work. Dr. Robinson also stated that he had advised an x-ray of Hood's stomach, but that it had not been done because Hood could not afford it.
 
 
 7
 In August of 1975, Dr. Cale examined Hood at the request of Hercules but he did not order an x-ray. Shortly thereafter, Hercules informed Hood that he was being removed from the employment rolls because the doctor had informed the company that Hood was unable to return to work. Hood subsequently filed a grievance against Hercules. A short time later, Hood underwent an x-ray examination, which was paid by his union. The report of the radiologist stated that no ulceration was demonstrated at that time. A few days later, Hercules offered to reinstate Hood on the condition that he be placed on a sixty-day probationary period, at the conclusion of which his seniority would be returned to him. Hercules also required that Hood withdraw his claim asserted in the present action. Because Hood feared that under such an agreement he could lose both his seniority and his rights with the EEOC, he refused the offer.
 
 
 8
 The special master found that Hood had presented insufficient evidence to prove that Dr. Cale had not been acting in good faith in refusing to allow Hood to return to work during 1974. The special master concluded, however, that Dr. Cale's failure to order an x-ray in 1975 after Dr. Robinson's examination and Hercules' failure to re-employ Hood without imposing conditions on his seniority were discriminatory and required reinstatement, full seniority and back pay beginning after August 12, 1975, the date of Dr. Cale's examination of Hood.
 
 
 9
 Vallie Cunningham had worked for Hercules approximately one year when he was laid off for lack of work. During this period, he cut the fourth and fifth fingers of his left hand while going through a window of his brother's house, which had caught fire. He was called back in February of 1973, and underwent a physical examination in order to return to work. Dr. Cale determined that Cunningham could not return to work because of his injury. Cunningham demonstrated at the hearing that he could open and close his hand and stated that he felt he could do the work required of him at Hercules. Cunningham also testified that his left hand was in the same condition during the hearing as it had been at the time of Dr. Cale's examination. The company never allowed Cunningham to attempt to perform the work to see if he could do it adequately. At about the same time, Cunningham was examined by two doctors who were of the belief that Cunningham could return to work. Cunningham also contended that white employees at Hercules suffered similar accidents and continued their employment. One witness in particular received a similar injury but was retained by Hercules without being required to submit to an examination by a physician. After examining the above factors, the special master found that Cunningham had been the victim of racial discrimination and stated that he was entitled to seniority and back pay.
 
 
 10
 Hercules now raises a number of issues on appeal. Hood and Cunningham raise two additional issues in their cross-appeals. Hercules' first contention is that an incorrect legal standard was used in finding a violation of Title VII. In order to prove a violation of Title VII, the plaintiff is required to shoulder the initial burden of establishing a prima facie case of discrimination. Once this has been accomplished, the burden then shifts to the employer to clearly express by a preponderance of the evidence some legitimate, nondiscriminatory reason for the employer's actions. If the employer meets his burden of proof, thereby rebutting the plaintiff's prima facie showing, the plaintiff is then given an opportunity to demonstrate by a preponderance of the evidence that the employer's stated reasons for his actions were in fact a pretext. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973); Whiting v. Jackson State University, 616 F.2d 116, 120-21 (5th Cir.1980); Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1254-55 (5th Cir.1977).
 
 
 11
 In his opinion and findings, the special master stated that "the pertinent inquiry ... is whether the employees' separation or discharge was the result of an even-handed policy applied to both white and black employees alike, or was discriminatory." Hercules attacks this statement as being an erroneous interpretation of the McDonnell Douglas test. Hercules contends that such a ruling does not encompass the three steps required by McDonnell Douglas to show discriminatory employment practices. Hercules' entire argument on this point, however, is based on a narrow and strict reading of the special master's opinion. The statement of the special master quoted above was nothing more then a paraphrase from another Supreme Court case which clarified the McDonnell Douglas test. See Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting in part from Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977), in which the Court stated that "the central focus of the inquiry (in a Title VII case) is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' "
 
 
 12
 It is quite clear that the special master was aware of and understood the requirements of McDonnell Douglas. Under the heading of "Discussion of Applicable Legal Principles," the special master referred specifically to the McDonnell Douglas case and quoted from a portion of that opinion, which portion directly dealt with a plaintiff's prima facie case and a plaintiff's opportunity to show that the employer's stated reasons were nothing more than a pretext to disguise discriminatory antics.
 
 
 13
 The special master dealt individually with Hood's and Cunningham's cases, detailing the facts and occurrences pertinent to each of them. It is quite clear that, although the word "prima facie " was not used, the special master found that the facts were sufficient to show a prima facie case in both Hood's and Cunningham's cases. A prima facie case under McDonnell Douglas "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Construction Corp. v. Waters, 438 U.S. at 577, 98 S.Ct. at 2949. The findings of the special master, which are supported by the record, clearly make out a prima facie case under the McDonnell Douglas test.
 
 
 14
 The special master then discussed Hercules' stated reasons for the discharges and examined the plaintiff's arguments which alleged that the given reasons were a pretext. Although the special master did not use the word "pretext," he determined that Hercules' reasons were not sufficient to explain why Hood was not re-employed after August 12, 1975, nor why Cunningham was not entitled to employment after being called back. Although the words "prima facie " and "pretext" were not used in discussing the two men's cases, it is apparent that the special master examined all the pertinent facts and adhered to the McDonnell Douglas three-step test in finding racial discrimination. The terms "prima facie " and "pretext" alone are not magical, the absence of which will deny a plaintiff's access to a favorable judgment under Title VII. Although the special master's opinion might have been worded differently, there is no doubt that he followed the procedures laid down in McDonnell Douglas in arriving at the conclusion he did.
 
 
 15
 Hercules also states that the special master's finding that Hercules learned on September 6, 1975, that Hood no longer had an ulcer is clearly erroneous. Since there is evidence that an ulcer will not always appear in an x-ray, the special master might have overstated the situation in declaring that Hood no longer had an ulcer. At another point in the opinion, however, the special master stated the radiologist's report more accurately by noting that the report "stated that no ulceration was demonstrated at that time." Additionally, it is undisputed that Hercules was aware of the radiologist report since the finding in the report was part of the reason that Hood was offered his job back on the probationary basis mentioned earlier. In light of the foregoing, this court does not perceive that the special master's finding in this regard was clearly erroneous.
 
 
 16
 Hercules also objects to the special master's finding that the company had no right to deprive Hood of his seniority rights until he had been out of work for eighteen months. The special master based this finding on the collective bargaining agreement, which forbids depriving an employee of his seniority rights until he has been laid off for lack of work for eighteen months. Hercules contends that the company's pension plan, which was incorporated by reference into the collective bargaining agreement, provided that leave of absences without pay could not be extended past twelve months. Since twelve months had elapsed since Hood had worked, Hercules contends they had every right to drop him from their rolls at that time. After examining the pleadings and the transcripts in this case, there is no indication that Hood had received a leave of absence. The record tends to indicate that Hood had been laid off, and the evidence shows that Hood believed he had been laid off. This is re-enforced by the fact that the company often would lay off an individual if he could not perform his duties due to medical reasons. The finding is also re-enforced by the fact that Dr. Cale stated that Hood could only perform light work and that no such work was available at Hercules, indicating that Hood was thus laid off for lack of work. This court finds that there is more than sufficient evidence supporting the special master's finding on this point, and his finding is not clearly erroneous.
 
 
 17
 Hercules argues that the special master never made any finding that Hood and Cunningham were fired because of racial discrimination. Hercules argues that the special master's findings were based on the simple requirement that all employees be treated even-handedly, regardless of race. Obviously, to prevail under Title VII, a plaintiff must prove that he or she has been the victim of racial, religious or gender-based discrimination. See Burdine v. Texas Department of Community Affairs, 608 F.2d 563, 566 (5th Cir.1979), cert. granted, --- U.S. ----, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980). This court considers Hercules' objection on this point to be wholly and completely without merit. The special master's introductory portion of his opinion specifically referred to discrimination vis a vis blacks and whites. A sensible reading of the special master's opinion makes clear that he found racial discrimination perpetrated by Hercules against Hood and Cunningham.
 
 
 18
 Hercules also objects to the special master's finding that the company's reasons for different treatment of a white employee similarly situated to Cunningham was not valid. Hercules refers to the case of a white employee with thirty years service who had sustained an injury comparable in severity to Cunningham's but which had been incurred during working hours. That employee was not required to undergo a physical examination prior to returning to work while Cunningham was forced to have an examination, which resulted in the doctor's recommendation that he not return to his duties. The evidence showed also that after his accident, the white employee did experience difficulties in performing his job due to a stiff finger, which problem was not rectified until he voluntarily underwent an amputation of that finger. Hercules contends that the white employee's position was different because of his lengthy employment record and his on-the-job injury, of which company policy does not require an examination as opposed to injuries that occur outside of working hours. The special master refused to accept such company policy as a legitimate reason for the differences in treatment. Clearly the special master considered the company's reasons as pretext, and, based upon the record before this court, we cannot say that his finding on this point was clearly erroneous or an abuse of discretion.
 
 
 19
 Hercules also contends that the district court's Memorandum of Decision regarding back pay was in error since the district court awarded the back pay on the basis of the healthiness of Hood, which the trial court found to be quite questionable. Naturally, a court should not award back pay unless the wages are properly owed to the employee. Jinks v. Mays, 464 F.2d 1223, 1226 (5th Cir.1972). But the purpose of back pay awards is to make whole the victims of employment discrimination. Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 252 (5th Cir.1974), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Aware of this, a court should determine whether an economic loss has been sustained, and if so, back pay should be awarded unless special circumstances are present. Marks v. Prattco, 607 F.2d 1153, 1155 (5th Cir.1979).
 
 
 20
 Regardless of the district court's remark regarding Hood's health, it was presented with evidence regarding Hood's back pay as well as Cunningham's. Clearly, the amount awarded was not speculative but was based upon facts supporting the ultimate award. This court refuses to find the award erroneous merely because of the district judge's comment in light of the facts that Hood's absenteeism during his employment at Hercules was not excessive, that the brevity of his employment in other jobs after his discharge was not based on health reasons and that Hood's own testimony demonstrated that he wanted to return to work. This court finds that the award of back pay to Hood was proper.
 
 
 21
 Finally, Hercules claims that the district court did not conduct an adequate review of the entire record to determine if the findings of the special master were clearly erroneous. After a thorough and complete review of the action taken by the district court, we find this challenge to be completely without merit.
 
 
 22
 Hood cross-appeals on the grounds that he was not awarded the correct amount of back pay. Hood contends that when he was removed from the employment rolls, he had been awarded the job of slurry operator, and Hood believes that the district court's award of back pay did not reflect the higher salary he would have received as slurry operator. Based upon the evidence presented to the district court, we hold that it was correct in its calculation.
 
 
 23
 Hood also contends that the district court had no right to offset any income earned from employment subsequent to the discharge which was not similar in nature to Hood's work at Hercules. 42 U.S.C. § 2000e-5(g) provides that "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." There is no distinction made between various types of interim earnings. This court will not create such a distinction. Under the statute, the amount which an employee would otherwise have been entitled to in the absence of the discrimination will be reduced by any earnings acquired during the interim period regardless of the type of work involved. See Taylor v. Philips Industries, Inc., 593 F.2d 783, 786 (7th Cir.1979).
 
 
 24
 Hood and Cunningham also contend that the court should have included interest in the back pay awards to restore them to their economic position. In the instant case, the district court considered the issue of awarding interest and decided it was not applicable in this case. An award of back pay is within the discretion of the trial judge, and this court finds no abuse of that discretion. Hood and Cunningham also object to the failure of the district court to include the cost of health insurance premiums in the back pay award. Again such a decision is discretionary with the trial judge, and this court finds no showing of an abuse of that discretion.
 
 
 25
 Cunningham also objects to the deduction by the trial court for his receipt of unemployment compensation benefits. Cunningham contends that such an offset is not allowable. This court finds that deductions for unemployment compensation benefits avoids any possibility of a double payment to a plaintiff, and, in any case, such a decision is within the discretion of the trial judge. See Satty v. Nashville Gas Co., 522 F.2d 850, 855 (6th Cir.1975), aff'd in part and vacated in part, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir.1969).
 
 
 26
 Hood and Cunningham also contend that the district court's award of $15,000 in attorneys' fees is insufficient. The court adequately examined the attorneys' fees issue, however, according to the guidelines delineated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974). Although a district court should award attorneys' fees to prevailing Title VII plaintiffs in all but exceptional circumstances, Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1321 (5th Cir.1980), the ultimate decision is within the court's discretion. Pettway v. American Cast Iron Pipe Co., 494 F.2d at 251. It appears to this court that no error was made in the district court's award of attorneys' fees.
 
 
 27
 AFFIRMED.
 
 
 
 *
 District Judge for the Northern District of Alabama, sitting by designation